IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

RECEIVED

APR **0 5** 2006

CLERK, U.S. DISTRICT **COURT**
ANCHORAGE, **ALASKA**

EXOUSIA, INC, d/b/a MAVRIK AIRE    )
                                   )
            Appellant,             )
                                   )
vs.                                )
                                   )    CASE NO.  AO5-0121CR (JWS)
UNITED STATES OF AMERICA           )
                                   )
                                   )
            Appellee               )
_____)

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ALASKA**
**MAGISTRATE JUDGE JOHN D. ROBERTS PRESIDING**

<u>**OPENING BRIEF OF APPELLANT**</u>

Charles Winegarden, ABA #8506089
100 Trading Bay Dr., Suite 8
Kenai, Alaska 99611
(907) 283-5774

Filed in the United States District
Court for the District of Alaska
this ___ day of April, 2006.

## CORPORATE DISCLOSURE STATEMENT

Exousia, Inc. has no parent corporation and there is no publicly held corporation that owns 10% or more of its stock.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

STATEMENT OF JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

    A.    The court erred in determining beyond a reasonable doubt that unnamed lake is inside the Noatak Controlled Use Area described in 5 AAC 92.540(9)(A)(i). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

        1.    The mouth of Sapun Creek must be preciously located by a properly authorized entity and/or individual. . . . . . . . . . . . . . 11

        2.    The entire eastern boundary must be identified and located by proper authority . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18

        3.    The description of the CUA as set forth in the regulation does not provide adequate notice . . . . . . . . . . . . . . . . . . . . . . . . .19

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

## TABLE OF AUTHORITIES

**Cases**

*Bank of Heflin v. Miles*, 621 F.2d 108, 113 (5th Cir.1980) . . . . . . . . . . . . . . . . . . . . . . . 12

*Booth Fisheries Co. v. United States*, 6 F.2d 500 (9th Cir. 1925) . . . . . . . . . . . . . . 13,14

*Cotton States Mut. Ins. Co. v. Anderson*, 749 F.2d 663 (11th Cir. 1984) . . . . . . . . . . .12

*Rustad v. U.S.,* 258 F.2d 563,566 (9th Cir. 1958) . . . . . . . . . . . . . . . . . . . . . . . . . . .15,16

*State v. Bernard*, 652 O,2d 311 (Alaska 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15,16

*United States v. Peck*, 213 (1951) 95 F. Supp. 465, (1951) . . . . . . . . . . . . . . . 14,15,21

*U.S. v. Purdy,* 264 F.3d 809 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19

**Statutes**

34 Stat. 479 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12

43 Stat. 464 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

16 U.S.C. § 3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

**Regulations**

36 C.F.R. § 2.2(b)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3

36 C.F.R. § 1.6(g)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3

50 C.F.R. § 102.14 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

5 AAC 92.540 (9)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3,11,22

5 AAC 75.995 (27) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

**Rules**

F.R.Cr.P. 58 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

D.Ak.L.Cr.R. 58.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

iii

## STATEMENT OF JURISDICTION

This case was initiated by violation notice as a petty offense pursuant to

F.R.Cr.P. 58.   The case was tried to the court without a jury on September 29 and 30,

2005, United States Magistrate Judge John D. Roberts presiding.  Defendant was

adjudged guilty by Memorandum Opinion filed on November 22, 2005.  Imposition of

sentence commenced on December 13, 2005.  Defendant filed a timely appeal dated

December 14, 2005.  This court has jurisdiction pursuant to D.Ak.LCrR 58.1, and

F.R.Cr.P. 58(g).

## STATEMENT OF THE ISSUES

Did the court err in determining beyond a reasonable doubt that the unnamed lake is in fact located inside the Noatak Controlled Use Area described in 5 AAC (Alaska Administrative Code) 92.540(9)(A)(i)?

1.    Did the court err in determining that the mouth of Sapun Creek did not have to be precisely located by an entity and/or individual authorized to establish such boundary?

2.    Did the court err in determining that it was unnecessary to ascertain the entire eastern boundary of the Noatak Controlled Use Area by an entity and/or individual authorized to establish such boundary in order to ascertain if the unnamed lake was within or without the CUA?

3.    Did the court err in determining that the description of the Noatack Controlled Use Area as set forth in 5 AAC 92.540(9)(A)(i) provides adequate notice to Defendant of the eastern boundaries of corridor thereby protecting Defendant's constitutional rights to due process?

-2-

## STATEMENT OF THE CASE

Exousia Inc., doing business as Mavrik Aire was authorized to conduct business operations in the Noatak National Preserve, an area of the National Park System, under an Incidental Business Permit issued by the National Park Service.  This case was initiated by an agent of the National Park Service by Violation Notice # 292517 charging Exousia with a hunting violation on September 6, 2004, under 36 C.F.R. 2.2 (b)(4).  The federal charge was predicated upon a section of an Alaska state regulation, 5 AAC 92.540 (9) (A) (ii), which restricts the use of aircraft for transportation of big game hunters in a certain portion of the Noatak Preserve during a proscribed time period.

Exousia moved to dismiss the charges based on an exemption for transporting hunters, their equipment and game via aircraft to and between public airports pursuant to 5 AAC 92.540 (9) (A) (ii).  The Government made multiple attempts to amend the charges including an oral amendment during arraignment in addition to motions practice.  Although the proposed amendments were denied by the court, the Government was afforded the opportunity to impose new charges based on the original incident.

At the direction of the court, this case then proceeded on a superceding information charging Exousia with violating a condition of their Incidental Business Permit by transporting big game hunters by aircraft to a location within the Naotak Controlled Use Area (CUA) on or about September 1, 2004 in violation of 5 Alaska Administrative Code § 92.540(9)(A) constituting a violation of 36 C.F.R. § 1.6(g)(2) and 16 U.S.C. § 3.

Arraignment on the superceding charges was held on August 8, 2005.  After a

-3-

two day bench trial on September 29 and 30, 2005, the court found Exousia guilty as charged and this appeal follows.

## FACTS OF THE CASE

Exousia, Inc., is a Montana based corporation with authority to conduct business operations in the state of Alaska. (Tr. 2-55)  The nature of Exousia's air services in Alaska revolves around tourism-based services which include guided fishing, sightseeing, bear viewing, transportation of hunters, big game, and on-demand charters.  Exousia has been servicing clients in the Noatak National Preserve since 1998.  (Tr. 2-57) In 2004 Exousia, d/b/a Mavrik Aire was issued a special use permit by the National Park System authorizing the company to conduct air taxi services for the transportation of big game hunters in the Noatak National Preserve.  (Tr. 2-40)

Craig Schweitzer is the president of Exousia  and director of operations for the flight division. (Tr. 2-55) Craig made his first solo flight in 1982 at the age of fifteen (15). He has been flying as a commercial pilot in Alaska since 1993. (Tr. 2-56)

Exousia, d/b/a Mavrik Aire, was retained to provide air transportation services for a party of four in the Noatak Preserve to accommodate a drop hunt for caribou during the first week of September, 2004.  The party consisted of Henry Corning, Huey Johnson, Greg Bailey, and Tyler Johnson.  Mr. Johnson initiated contact with Exousia and reserved the dates for the hunt.  Mr. Corning provided payment for the group as a whole.  (Tr. 1-15)

The party flew to Kotzebue, Alaska the day before their scheduled departure into the field.  They were met in Kotzebue by a company representative and were instructed as to preparations for the following days departure.  (Tr. 1-20) As scheduled, the party

-4-

departed Kotzebue the next morning, September 1, 2004, on a flight piloted by Craig

Schweitzer. (Tr. 2-46) The plane, a turbine Otter on floats, flew north from Kotzebue

for approximately an hour. (Tr. 1-24)

Although the party had no specific destination in mind, in a brief conversation

before the flight departed, the party had expressed their desire to find an area that

would provide a reasonable opportunity to hunt caribou with both bows and rifles. (Tr.

2-98) After flying for approximately an hour, the group spotted an area near a small lake

that appeared to accommodate both the physical terrain sought and abundant game.

The group unanimously agreed that this was the location they were seeking. (Tr. 2-99)

Having determined where the party wished to be placed, Craig circled the area

making visual observations as to location, the direction of prevailing winds, insuring that

the flight path for landing and take off was free of obstructions, and assuring that there

was sufficient room to both land and take off. (Tr. 2-97)

Being a long time pilot in the area, Craig was familiar with Alaska hunting

regulations which restrict the use of aircraft for transportation of big game hunters in a

portion of the Noatak Preserve denoted as the Noatak Controlled Use Area (CUA) from

August 25 through September 15. In addition, Craig was familiar with a map included in

the 2004 Alaska hunting regulations booklet depicting the general area of the restricted

corridor, the eastern end of which is shown as a perpendicular line running north from

the mouth of Sapun Creek. The map and the regulation are the only aids supplied by

the Alaska Board of Fish and Game to ascertain the boundaries of the corridor and they

are insufficient to define the eastern boundary. (Tr. 2-62 & 2-63)

During the pass over of the lake on the date in question, Craig lined the aircraft

-5-

up on a north and south line at what he determined to be the lowest point that Sapun Creek entered the Naotak River and flying from north to south observed the lake in question was on the lefthand side and therefore outside of the restricted area. (Tr. 2-72) The hunting party was dropped off and set up camp in the northwest corner of the lake. (Tr. 1-25).

The day before the hunting party was due to be picked up, a Robertson helicopter containing three government agents landed just south of the camp. The pilot remained with the aircraft while holding an M-16. (Tr. 1-32) Park Rangers Kean Mihata and Dan Stevenson left the aircraft and approached the hunters in the camp. (Tr. 1-55) Mr. Corning inquired as to whether the Rangers would like to inspect their licenses and the game they had taken. Answering affirmatively, the Rangers proceeded with the inspection and found everything in order. (Tr. 1-32) Ranger Mihata took several pictures of the camp and marked a waypoint on his GPS after which the Rangers departed. (Tr. 1-56)

Ranger Mihata returned to the lake on the following day where he was dropped off to find a hidden location to film the extraction of the hunting party. (Tr.1-59 &1-60) After Ranger Mihata was picked up, he took additional GPS readings over the lake as well as marking three waypoints on the north side of the Noatak River. These readings were taken from the helicopter Ranger Mihata was riding in. (Tr. 1-64) Approximately ten (10) days later while on a boat patrol of the Noatak River, Ranger Mihata used his GPS to record several waypoints at a location he determined was the mouth of Sapun Creek. (Tr. 1-59) Ranger Mihata testified that his choice of the location of the mouth of Sapun Creek was his "best estimation". (Tr. 1-84) Based on the information collected

-6-

as interpreted by the Garmin software used by Ranger Mihata, he once again estimated that the lake was approximately two point two [2.2] miles south of the Noatak River and about two point three [2.3] miles west of the mouth of Sapun Creek.   Ranger Mihata then issued a violation notice to Exousia. (Tr. 1-64 & 1-65)

Trial was set to commence on September 29, 2005 for two days.  In preparation for trial, Ranger Mihata returned to the area in question in August of 2005 in the company of a fellow Park employee, Joel Cusick who is employed as the Alaska Region Chief GPS/GIS Specialist for the Western Arctic National Parklands.  Using a variety of GPS receivers, Ranger Mihata and Mr. Cusick took additional GPS readings along each bank of the Noatak River.  (Tr. 1-68)

Mr. Cusick describes his job as putting GPS data onto maps to tell a story.  (Tr. 1-98)  Mr. Cusick does not actually generate his own maps, but instead uses previously generated maps from various sources as a back drop for positioning data retrieved from GPS units with the aid of computer software programs.  (Tr. 1-101) Mr. Cusick was accepted as an expert witness on the topic of GPS and mapping. (Tr. 1-102) He offered testimony as to the evolution, operation and use of the GPS.

Mr. Cusick testified that GPS readings were accurate to plus or minus ten (10) meters.  However, Mr. Cusick also testified that all of the GPS readings offered at trial were straight line (line of sight) measurements as opposed to actual ground miles.  (Tr. 2-16) In other words the GPS measurements do not take into account the actual terrain of the ground and therefore do not represent the true distance measured.

Mr. Cusick further testified that based on his visual observations and on the data he gathered, the USGS maps, including those used as the backdrop for the computer

-7-

generated maps offered at trial, were quite accurate and very, very good.  Tr. (2-6 & 2-7) On the other hand, under cross examination, Mr. Cusick admitted that in areas where rivers and streams are found, maps do not accurately depict the area due to the constantly shifting and changing environment.  In fact Mr. Cusick stated, "Maps are not accurate the day they're published." He further testified that the degree of accuracy represented by the National Mapping Standards stand all by themselves only on features that are stable over time because that's really the only way you can assess map accuracy.  (Tr. 2-21) Mr. Cusick took no readings at the mouth of Sapun Creek, and offered no testimony of any sort regarding the eastern boundary of the Noatak Controlled Use Area.

The only witness for the prosecution that offered testimony regarding the mouth of Sapun Creek, which by regulation is one point of the eastern boundary, was Ranger Mihata. Ranger Mihata testified that his understanding of the mouth of a creek is where the water flows out of the creek into another body of water.  (Tr. 1-67) He further testified that he was not familiar with 5 AAC 75.995 the Alaska Fish and Game regulation which defines the mouth of a stream when such stream is not marked by the State of Alaska.  (Tr. 1-83 & 1-84) Ranger Mihata verified that Sapun Creek had braiding at its mouth but did not elaborate on how extensive the braiding was.  He stated that he selected two of the braids in which water was flowing at the time he was there which represented his best estimation as to the mouth of Sapun Creek.  (Tr. 1-84) His selection was completely arbitrary.

Ranger Mihata further testified that he made no effort to locate or define the entire eastern boundary of the restricted corridor based on his assumption that such

-8-

information was not necessary. When queried as to where, or to whom, he would go if he wanted to ascertain precisely where the entire eastern boundary was located, Ranger Mihata answered that he would go to the Alaska Fish and Game. When asked if he had contacted the Alaska Fish and Game, the answer was that he had not. Ranger Mihata also confirmed that no one from Alaska Fish and Game had determined whether the lake was inside or outside the eastern boundary. (Tr. 1-88)

In support of its case, Exousia called Roland Maw as an expert witness. Among many other things, Mr. Maw's extensive education and experience included 27 years as an instructor at Lethbridge Community College in Lethbridge, Alberta with the Department of Environmental Science, service as a commissioned officer with the State of Alaska Division of Parks, and superintendent of the Chugach State Park. (Tr. 2-103 to 2-113) Mr. Maw is an expert in air photo and USGS map interpretation and has generated hundreds of maps. During his teaching career in Canada, Mr. Maw taught courses in the use and interpretation of GPS and the use, interpretation and creation of map. (Tr. 2-105 to 2-109) He also worked directly with the Canadian government assisting in the adjudication of boundary conflicts involving rivers and creeks and has acted as an expert witness in the past on issues involving the interpretation of maps and GPS operation and field application. (Tr. 2-110 & 2-111) In line with these duties, Mr. Maw is familiar with the legal definitions of river bed and mouths of creeks and rivers and the interpretation of those legal definitions as he taught them in his courses and used them during his career. (Tr. 2-111) He was qualified as an expert in GPS use and interpretation, map use and interpretation and in determining water course beds and shores. (Tr. 2-114) He was the only expert so qualified.

-9-

Mr. Maw testified that the USGS map of the Baird Mountains relied upon by the prosecution was actually generated from aerial photos taken over 50 years ago in 1955 and that the map has never been field tested. (Tr. 2-1114 & 2-115) Mr. Maw further testified that the map does not give an accurate picture of the mouth of Sapun Creek as he himself witnessed it both from the air, and from physical investigation on the ground. Mr. Maw observed the braiding of Sapun Creek when flying over the area. He then had the pilot fly a due south course when passing over a portion of the Sapun Creek braiding, noting that there was further braiding to his right. Mr. Maw testified that he observed that Lake 35 was to his left or outside of the Corridor. It is Mr. Maw's expert opinion that Lake 35 is outside the of the Corridor. Mr. Maw landed to investigate the braiding and confirmed his analysis. (Tr. 2-134 to 2-142)

Park Ranger Dan Stevenson, the head park ranger in the Noatak area, testified as a rebuttal witness. Ranger Stevenson directed attention to a sand bar upriver from Sapun Creek. He testified that the sand bar has been used by pilots in the area for a number of years because , "it's just above the general understanding of the controlled use area." (Tr. 2-176) During his testimony, Ranger Stevenson drew a map of the area which contained his rendition the Noatak River and the major drainages into the river of which Sapun Creek was one of the drainages. (Tr. 2-178) Ranger Stevenson's drawing was entered as Exhibit 28. Ranger Stevenson testified that he informs hunters that the Sapun Creek drainage is the "end boundary" of the Corridor. He did not cite any authority which supported his conclusion that the Sapun Creek drainage is the "end boundary". (Tr. 2-178) Unfortunately, Ranger Stevenson's testimony shows that he, as head park ranger, either is not familiar with 5 AAC 92.540(9)(A) or does not

-10-

understand it as 5 AAC 92.540(9)(A) clearly states that it is the mouth of Sapun Creek
which marks one point on the eastern boundary of the restricted use area.

It is important to note that Ranger Stevenson did not rebut the testimony of
expert Roland Maw concerning the braiding of Sapun Creek although he certainly had
the opportunity while giving rebuttal testimony. In addition, Ranger Mihata did not return
as a rebuttal witness which is significant in that he had observed the braiding and was in
a position to refute Mr. Maw's statement concerning braiding if the prosecution wished
to refute Mr. Maw's testimony.

## SUMMARY OF THE ARGUMENT

The state regulation on which the federal conviction is predicated is
unconstitutionally vague, imprecise, indefinite and ambiguous. The evidence presented
at trial was insufficient to overcome the deficiencies of the regulation in question. The
prosecution produced no witnesses from the State of Alaska to verify the conclusions of
the federal agents prosecuting the state regulation. Under the circumstances of this
case the conviction must be reversed.

## ARGUMENT

The court erred in determining that the Government proved beyond a reasonable
doubt that the lake landed on by Exousia agents in September of 2004 is located within
the boundaries of the Noatak Controlled Use Area as defined by 5 AAC (Alaska
Administrative Code) 92.540(9)(A)(i).

1.    The mouth of Sapun Creek must be preciously located by a properly
authorized entity and/or individual.

The boundaries of the Noatak CUA are set out in 5 AAC 92.540(9)(A)(i) as

-11-

follows:

> (i) the area consists of that portion of Unit 23 in a corridor extending five miles on either side of, and including the Noatak River, including the river, beginning at the mouth of the Noatak River, and extending upstream to the mouth of Sapun Creek.

5 AAC 75.995 (27) is a Fish and Game regulation that defines stream mouth as:

> "The downstream point defined as a straight line running from the most downstream extremity on one stream bank to the most downstream extremity on the other stream bank or a point defined and marked by the Department.

It is well settled that state courts have the right to construe their own statutes.[1]

Alaska has a long line of cases dealing with the mouth of rivers, streams, and creeks as boundary markers for prohibited areas. For example, by Act of June 26, 1906 ( 34 Stat. 479) Congress passed into law a statute which prohibited, among other things, the erection or maintenance of any dam, barricade, fence, trap, fish wheel, or other fixed or stationary obstruction, except for purposes of fish culture, in any of the waters of Alaska, at any point where the distance from shore to shore is less than 1,000 feet, or within 500 yards of the mouth of any creek, stream, or river into which salmon run with the exception of the Karluk and Ugashik rivers, with the purpose or result of capturing salmon or preventing or impeding their ascent to the spawning grounds. The Secretary of Commerce was directed and authorized to have all such obstructions removed or destroyed. The Act also made it unlawful to fish for, take, or kill any salmon of any species by any means except by hand rod, spear, or gaff in any of the creeks, streams,

---

[1] *Cotton States Mut. Ins. Co. v. Anderson* 749 F.2d 663 (11th Cir. 1984) @ 667 citing *Bank of Heflin v. Miles,* 621 F.2d 108, 113 (5th Cir. 1980) @ 114

or rivers of Alaska, or within 500 yards of the mouth of any such creek, stream, or river

over which the United States has jurisdiction, excepting the Karluk and Ugashik rivers.

At the outset, there were no directives as to how to determine the location, and

thus the starting point for the 500 yard measurement, of the mouth of the creeks,

streams or rivers just as there are no directives in the regulation at issue here.

**Historically, the mouths of actively flowing bodies of water such as streams,**

**creeks, and/or rivers are constantly changing, shifting and moving. What exactly**

**determines the mouth is subjective and therefore unstable and unreliable.** With

the passage of time, the difficulties encountered in the administration of the law and the

injustice that could result from such administration prompted Congress to amend the

law by the Act of 1924 ( 43 Stat. 464). The amendment added a provision that the

mouth of the creek, stream, or river should be taken to be the point determined as such

mouth by the Secretary of Commerce, and marked in accordance with his

determination.

In July of 1924, Booth Fisheries Company was charged and eventually convicted

of two criminal violations of the Act of 1924. The activities charged as violations took

place after the amendment of the Act, but before the Secretary had implemented the

changes determining and marking the mouths. Booth appealed the conviction to the 9th

Circuit Court of Appeals. The following is set out in *Booth Fisheries Co. v. United*

*States,* 6 F.2d 500 (9th Cir. 1925):

> Whether counsel is correct or not we need not inquire, **but the**
> **mouth of a stream cannot be ascertained with**
> **mathematical precision, and the uncertainty of the**
> **situation demonstrates the necessity for some fixed rule**

-13-

**on the subject.**

> ...the location of mouth of the stream by the Secretary is indispensable to give certainty and precision to the statute. Until that has been done, the initial point from which measurements are to be made cannot be known, and without an initial point from which to measure it would, of course, be impossible to determine the boundaries of the prohibited area. Id @ 501

As a result of this ruling the convictions were reversed and the matter was remanded for a new trial consistent with the decision of the court.

One point of the eastern boundary of the Noatak Controlled Use Area is identified as the mouth of Sapun Creek. Ranger Mihata testified that there is no point defined or marked by the Alaska Fish and Game identifying the mouth of Sapun Creek. (Tr. 1-83) As pointed out by the *Booth* court, **"until that has been done, the initial point from which measurements are to be made cannot be known, and without an initial point from which to measure it would, of course, be impossible to determine the boundaries of the prohibited area."** *Booth* is exactly on point in this matter because without the specific identification of the mouth of Sapun Creek and no point specified for the location of the northern point of the eastern boundary, it is impossible to discern the end of the corridor in question.

A similar situation was faced in *United States v. Peck,* 13 Alaska 213 (1951) 95 F. Supp. 465, (1951). Defendants were convicted of commercially fishing for salmon within 500 yards of the mouth of Peterson Creek which was not marked. The sole question on appeal was **what constitutes the mouth of a stream**.

-14-

In 1944, the Secretary of the Interior promulgated 50 C.F.R. § 102.14 providing

that "Where the closed area at the mouth of a stream has not been designated by signs

erected by the Fish and Wildlife Service and where the extent of the closed area is fixed

by measurement from the mouth of a stream, the mouth of such stream shall be at a

line between the extremities of its banks at mean low tide."  The court was asked to

determine whether this regulation was sufficient to satisfy the government's

responsibility to determine and mark the mouth of streams, creeks, and rivers.  The

court ruled in pertinent part as follows:

> But since the line of mean low tide is itself extremely difficult,
> if not impossible, of determination with precision and must,
> therefore, remain largely a matter of guesswork, the result
> varying with each individual, it is obvious that the determination
> of the mouth of a stream will vary accordingly.  **Unless,
> therefore, the mouth as determined by the Secretary is
> marked, fishermen would not only not be able to
> determine the limits of the closed area, but the regulation
> itself would be lacking in that certainty which is requisite
> of any penal statute and without which there can be no
> conviction or forfeiture.** Id. @ 467

The regulation in question is equally void of the certainty required of any penal

statute because it does not sufficiently define the boundaries of the prohibited area, the

beginning and end of which are the mouths of rivers and/or streams, in plainly

discernable  navigation standards.  The regulation is therefore constitutionally deficient.

A similar argument was made in *Rustad v U.S.,* 258 F.2d 563, 566 (9th Cir. 1958).

However, in *Rustad* the court upheld several criminal convictions of commercial fishing

vessels for violations of a Department of Interior regulations restricting fishing in the

waters of Alaska.  The court accepted both the arguments of the fishermen citing

indefinite description of the boundaries of the prohibited area, and the arguments of the

government claiming the clear language of the regulation, as valid theories of law. In

determining which legal theory best fit the situation, the *Rustad* court ruled:

> Zimovia Strait **is no river mouth which may have a**
> **changing and indeterminate location,** but a well-defined
> **land conformation** clearly marked on the official charts of
> the United States Coast & Geodetic Survey Maps.

The decision in *Rustad* is important here since the convictions were upheld

because the area in question was a well-defined land conformation not a river mouth

subject to changing and indeterminate locations. In this matter, the beginning and

ending boundaries of the area in question include **river mouths which may have a**

**changing and indeterminate location.** Further, the regulation is silent on what

constitutes the northern point of the eastern boundary beyond two state maps depicting

divergent methods of defining the bouandry.

Moreover, it is not as if the agency that created the regulation is unaware of the

requirements needed to aid boundary identification. Take for instance the closest CUA

to Noatak, the Koyukuk CUA located in game management unit 24. The purpose of the

Koyukuk CUA is, like the Noatak CUA, to restrict the use of aircraft. The area is

described as follows:

> portions of Unit 21 and 24 bounded by a line from the north
> bank of the Yukon River at Koyukuk at 64°28.42'W.long., then
> northeasterly to the confluence of Billy Hawk Creek and the
> Husila River at 65°56.66' N. lat., 156°40.81'W. long, then
> northeasterly to the Daki River at 66°02.56' N. lat., 156°12.71'
> W. long., then easterly to the confluence of McLanes Creek
> and the Hogatza River 66°00.31' N. lat., 155°18.57 W. long.,
> then easterly to the middle of the Hughes airstrip 66°02.56' N.
> lat., 154°15.69' W. long. Then south to Little Indian River at

-16-

> 65°47.07' N. lat., 154°15.69' W. long., then southwesterly to the
> crest of Hochandochita Mountain at 65°31.87' N. lat.,
> 154°52.18' W. long., then southwest to the mouth of
> Cottonwood Creek at 65°13.00' N. lat., 156°6.43' W. long., then
> southwest to Bishop Rock (Yistletaw) at 64°49.35' N. lat.,
> 157°21.73' W/ long., then westerly along the north bank of the
> Yukon River (including Koyukuk Island) to the point of
> beginning.

The boundaries of the Koyukuk CUA are set out in explicitly discernable

coordinates that leave no doubt about the area that is off limits.  It should be noted that

the confluence of Billy Hawk Creek and the Husila River, the confluence of McLanes

Creek and the Hogatza River, and the mouth of Cottonwood Creek have all been

determined and clearly marked in specific terms.  The defined boundaries of the

Koyukuk CUA stand in stark contrast to the Noatak CUA which is completely devoid of

the specificity required to give notice of the area that is off limits.

Testimony in this case underscores the uncertainty of the regulation in question.

Ranger Mihata and Ranger Stevenson could not discern from the air whether or not the

lake in question was in the CUA.  Ranger Mihata testified that he took GPS readings on

the ground from the vicinity of the hunting camp because it was in question whether or

not the area was in the CUA.  (Tr. 1-58) Ranger Mihata further testified that the location

he chose as the mouth of Sapun Creek was his "best estimation". (Tr. 1-84) Though

Ranger Mihata's choice was completely arbitrary, at least he attempted to locate the

mouth of Sapun Creek.  Ranger Stevenson, on the other hand, completely disregarded

the mouth of Sapun Creek and simply informs hunters that it is the Sapun Creek

drainage that is the boundary of the CUA.  (Tr. 2-178) The fact that these two officers,

each charged with enforcing the state regulation in question, have different definitions of

-17-

the boundary of the CUA speaks for itself.  Further, neither of the officers in question are authorized to define the boundaries of the restricted area and neither sought clarification from the authorized source before proceeding with prosecution.

    2.   <u>The entire eastern boundary must be identified and located by proper</u> <u>authority.</u>

    There was no testimony or evidence offered that the State of Alaska had set the boundary or line marking the end of the Corridor.  The State of Alaska has been inconsistent in the way it has shown the location or declination of the line or boundary marking the Corridor as show on Exhibit 2, the State of Alaska Web Site as compared to how it is shown on Exhibit 15-7, the map in the State of Alaska Fishing Regulation Handbook.  Ranger Mihata, when asked to compare the two maps, admitted that the eastern boundary of the CUA was depicted differently on each of the State maps.  (Tr. 1-79)

    The court noted the inconsistency of the depiction of the eastern boundary on pgs. 5 and 6 of the Memorandum Opinion.  Because of the inconsistency, the court concluded that the maps were merely intended to orient a potential hunter to the "general location" of the CUA.  In fact the inconsistency demonstrates reasonable doubt as to exactly where the eastern boundary is located.  It is anyone's guess what location or declination is desired by the State of Alaska.

    Ranger Mihata determined that it was unnecessary for him to establish the entire eastern boundary of the restricted corridor because by his calculations he had determined that the lake was west of mouth of Sapun Creek.  When queried as to where, or to whom, he would go if he wanted to ascertain precisely where the entire

-18-

eastern boundary was located, Ranger Mihata answered that he would go to the Alaska Fish and Game. When asked if he had contacted the Alaska Fish and Game, the answer was that he had not. Ranger Mihata also confirmed that no one from Alaska Fish and Game had determined whether the lake was inside or outside the eastern boundary. (Tr. 1-88)

Nevertheless, ascertaining the entire length of the eastern boundary is required. Whether or not the lake is actually west of the mouth of Sapun Creek is immaterial if the angle of the entire eastern boundary is such that lake is outside the restricted area.

The prosecution produced no witnesses from the State of Alaska to testify concerning the location of the mouth of Sapun Creek nor to testify as to the location of the "end boundary " which begins at the mouth of Sapun Creek and marks the end of the Corridors on each side of the Naotak River. Without such testimony, it cannot be ascertained beyond a reasonable doubt that the lake is within the restricted area.

3.   The description of the CUA as set forth in the regulation does not provide adequate notice.

In order for a statute and/or regulation that subjects individuals to criminal prosecution to be constitutionally adequate, it must clearly and definitively identify the proscribed conduct. This principle is recognized by both state and federal precedent. See, for example, State v. Bernard, 652 P.2d 311 (Alaska 1981) where the Alaska Supreme Court succinctly ruled:

> It axiomatic that a vague, imprecise, indefinite or ambiguous regulation, the breach of which carries a criminal penalty, should be strictly construed in favor of the accused. Id @ 313

-19-

The 9th Circuit Court of Appeals made a similar ruling in *U.S. v. Purdy,* 264 F. 3d

809 (9th Cir. 2001) when it ruled:

> It is a basic principle of due process that an enactment is
> void for vagueness if its prohibitions are not clearly defined.
> Id @ 811

That being the case, the boundaries of the restricted area must be plainly

discernable by any individual or entity affected by the restriction.  That is certainly not

the case with the regulation in question.

The mouth of Sapun Creek empties into the Noatak River on only one side giving

only one point.  Without 2 defined points, a straight line can not be drawn and the exact

angle that line would make with the river can not be determined.  Consequently, the end

of the corridor can not be precisely determined and the regulation lacks the required

specificity to give adequate notice.

In *State v Bernard,* supra, the court was asked to determine whether or not the

construction of an Alaska regulation promulgated by the State Division of Fish and

Wildlife Protection setting out the minimum legal size for blue king crab was void due to

vagueness, allowed arbitrary enforcement, and failed to give adequate notice as to the

conduct prohibited by the regulation. The *Bernard* court opined as follows:

> ...Where a regulation is capable of two or more equally logical
> interpretations, it is ambiguous...That one form of
> measurement is more logical than the other does not cure the
> ambiguity of the regulation when the less logical method is not
> strained or outlandish.  Id @ 313

In this instance the State itself has portrayed the eastern boundary in two

conflicting ways leaving the door open to at least two equally logical interpretations.

The court relied heavily on the U.S.G.S Baird Mountain map in it's determination

-20-

that the lake was west of the mouth of Sapun Creek and therefore inside the restricted area. However, even the Government's expert witness Mr. Cusick admitted that in areas where rivers and streams are found, maps do not accurately depict the area due to the constantly shifting and changing environment. In fact Mr. Cusick stated, "Maps are not accurate the day they're published." He further testified that the degree of accuracy represented by the National Mapping Standards stand all by themselves only on features that are stable over time because that's really the only way you can assess map accuracy. (Tr. 2-21)

Exousia's expert Roland Maw testified that the depiction of the entry of the creeks into the Noatak River on the U.S.G.S. maps was not consistent with his visual observations of the area. (Tr. 2-123 & 2-124)

As quoted above from *United States v. Peck,* (1951) 95 F. Supp. 465 supra, the court opined as follows:

> But since the line of mean low tide is itself extremely difficult, if not impossible, of determination with precision and must, therefore, remain largely a matter of guesswork, the result varying with each individual, it is obvious that the determination of the mouth of a stream will vary accordingly.

The situation foreseen by the *Peck* court is plainly evident here. The federal officers enforcing the state regulation could not even reach a consensus as to the eastern boundary, each propounding their individual conclusions. In short, their individual assessments were nothing but guesswork. As plainly demonstrated, the regulation lacks the specificity required by all penal statutes to meet constitutional standards.

-21-

**Conclusion**

Legal precedent has been firmly set at both the 9th Circuit Court of Appeals and the Supreme Court of the State of Alaska that a regulation lacking in that certainty which is requisite of any penal statute cannot sustain a criminal conviction. The regulation in question, 5 AAC 92.540 (9) (A), is just such a regulation. Because the mouth of Sapun Creek and the line passing through it marking the end of the boundary have never been defined and marked , it is impossible to determine exactly where the 220 mile corridor ends. The regulation is silent on the northern point of the eastern boundary. The State itself has portrayed the eastern boundary in two (2) different manners resulting in a regulation which is not only ambiguous, but denies Exousia the constitutional right to due process by giving insufficient notice and allowing arbitrary and subjective enforcement.

The evidence at trial was insufficient to overcome the deficiencies of the regulation. Under precedent of the above cited case law, both state and federal, Exousia conviction must be overturned.

**DATED** this 2nd day of April, 2006.

C. A. Winegarden

Charles Winegarden AK Bar # 8506089
Counsel for Defendant

-22-