DEBORAH M. SMITH
ACTING UNITED STATES ATTORNEY

LISA D. DOEHL
SPECIAL ASSISTANT U.S. ATTORNEY
Department of the Interior
Office of the Solicitor, Alaska Region
4230 University Drive, Suite 300
Anchorage, Alaska 99508-4626
Phone (907)271-4131/FAX (907)271-4143



## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

EXOUSIA, INC., d/b/a MAVRIK AIRE )
                                 )
                 Appellant,      )        CASE NO. A05-0121 CR (JWS)
                                 )
        vs.                      )
                                 )
UNITED STATES OF AMERICA         )
                                 )
                 Appellee        )


## APPELLEE'S BRIEF IN OPPOSITION TO APPEAL


## A. INTRODUCTION

Comes now the United States, by and through its undersigned counsel, and responds to Appellant's Opening Brief.  This matter is a Class B misdemeanor and was initiated through a violation notice.  In a superseding information, Exousia, Inc, d/b/a Mavrik Aire ("Exousia" or "Mavrik Aire") was charged with violating a condition of the Incidental Business Permit it obtained from the National Park Service to conduct business operations within Noatak National Preserve in Alaska on September 1, 2004 by transporting big game hunters by aircraft to a location within the Noatak Controlled Use Area ("CUA")

in violation of 5 Alaska Administrative Code § 92.540(9)(A), constituting a

violation of 36 C.F.R. § 1.6(g)(2) and 16 U.S.C. § 3.  On September 29 and 30, 2005,

after several motions, the case was tried without a jury before United States

Magistrate Judge John D. Roberts.  On November 22, 2005, Magistrate Judge

John D. Roberts found Appellant guilty in a Memorandum Opinion. (Docket

#78).  On December 13 2005, Judge Roberts fined Exousia $500 and imposed a

$50 assessment.

Exousia appeals Judge Robert's Order of November 22 and seeks to

overturn its conviction.  Exousia contends that there was insufficient evidence for

Judge Roberts to conclude that the unnamed lake where Exousia took the

hunters ("Lake 35") is located within the Noatak CUA, specifically, to the west of

the eastern boundary which is defined by the mouth of Sapun Creek.  In

addition, Exousia argues that the state regulation establishing the Noatak CUA is

"unconstitutionally vague, imprecise, indefinite and ambiguous" as to its eastern

boundary.  The constitutional challenge largely reiterates the arguments in

Appellant's Motion to Dismiss of August 22, 2005, except that Defendant has

abandoned its previous arguments that the southern boundary of the CUA is

unconstitutionally vague.  Judge Roberts rejected Exousia's constitutional

challenge in his Order of September 22, 2005, when he denied one of Appellant's

Motions to Dismiss. (Docket No. 55). Appellant has not appealed that Order.

As explained further below, the evidence is more than sufficient for Judge Roberts to conclude that Exousia violated this state regulation and thus committed the federal offense charged. Furthermore, the state regulation is not void for vagueness as applied to the facts of this case because it describes the eastern boundary with sufficient clarity to put Exousia on notice that Lake 35 is within the boundary. Thus this court should affirm Judge Robert's decision and his conviction of Appellant.

## B. STATEMENT OF JURISDICTION

A defendant has an appeal of right to the district court of the district in which the offense was committed in all cases tried by a U.S. Magistrate Judge under 18 USC 3401. 18 U.S.C. § 3402. See also D.Ak.L.Cr.R 58.1 and F.R.Cr.P. 58(g)(2)(B).

## C. ISSUES PRESENTED

1. Whether any rational trier of fact could have found that Lake 35 is located within the boundaries of the Noatak CUA.

2. Whether as a matter of law the Noatak CUA regulation describes the eastern boundary with sufficient clarity to put a person of average intelligence on notice that Lake 35 is located within the Noatak CUA.

## D. THE REGULATION AT ISSUE

Title 5, section 92.540(9)(A)(ii) of the Alaska Administrative Code

("AAC") restricts hunting in the Noatak CUA:

> (ii) the area is closed from August 25 through September 15 to the
> use of aircraft in any manner for big game hunting, including
> transportation of big game hunters, their hunting gear, or parts of
> big game; however, this provision does not apply to the
> transportation of big game hunters, their hunting gear, or parts of
> big game to and between public airports.

Caribou is big game. 5 AAC § 92.990(a)(5).  Alaska hunting regulations

further define "transport" as "to ship, carry, import, export, or receive or deliver

for shipment, carriage or export". 5 AAC § 92.990(a)(41).

The Alaska Supreme Court upheld the validity of the Noatak CUA

regulation in *Interior Alaska Airboat Association v. Alaska*, 18 P. 3d 686 (Alaska

2001).  The Alaska Supreme Court summarized the intent of the Board of Game

in establishing the regulation as follows:

> The justification for the Noatak Controlled Use Area is two-fold.
> First, the restrictions on hunter access by airplane are maintained in
> order to help reduce harvests on a declining moose population.
> Second, the prohibition on aircraft use is maintained to resolve
> conflicts between hunters who use aircraft for access and hunters
> who use boats.  Most hunters who use aircraft do not reside on the
> Noatak and most local hunters use boats.  The Board of Game
> found that "conflict occurs when low-altitude flights by aircraft-
> borne hunters disturb wildlife and disrupt hunting activities of
> those using boats.  Conflict also occurs when hunters transported
> by aircraft occupy the best camping and hunting locations along
> the river, thereby preventing local residents from using traditional
> hunting sites."

18 P.3d at 687-688.

Appellee's Brief                                        4
Case No. A05-0121CR (JWS)

The State of Alaska has defined the Noatak CUA in 5 Alaska Admin. Code section 92.540(9)(A)(i) as:

> (i) the area consists of that portion of Unit 23 in a corridor extending five miles on either side of, and including, the Noatak River, including the river, beginning at the mouth of the Noatak River, and extending upstream to the mouth of Sapun Creek;

The State of Alaska provides notice of the Noatak CUA to the public through the "Alaska Hunting Regulations Booklet" it makes available to the public at numerous stores throughout Alaska where the public can buy hunting licenses. Tr. 1-50. The Alaska Hunting Regulations Booklet No. 45, effective July 1, 2004 – June 30, 2005, highlights Sapun Creek and the Noatak CUA corridor in the map of Game Management Unit 23 and also describes the area as follows:

> a corridor extending five miles on either side of the Noatak River beginning at the mouth of the Noatak River and extending upstream to the mouth of Sapun Creek.

U.S. Exh. 15. See also Defendant's Exh. F. In addition, the Alaska Department of Fish and Game, Division of Wildlife Conservation describes and shows Sapun Creek and the corridor on a map of the Noatak Controlled Use Area it makes available on the internet at:

www.wildlife.alaska.gov/GIS/maps/specialareas/maps/CU_noatak.gif. Exh. 2.[1]

---

[1] This map is easily reached through www.wildlife.alaska.gov by selecting the link for wildlife conservation maps then for CUAs and then selecting the Noatak CUA.

## E.  FACTS OF THE CASE

### 1.  People and Events

The National Park Service issued a permit to Exousia Incorporated doing business as Mavrik Aire that authorized the company to provide big game transport and air taxi services during 2004 and 2005 within Noatak National Preserve, an area of the National Park System. Exh. 16; Mem. Op. at 2.  Brenda Coleman, the National Park Service concessions specialist who administers these types of permits, testified as to various documents related to this permit.

Exousia grossed over $70,000 in 2004 just from its activities in Noatak Preserve pursuant to this permit. Exh. 19 (Gross Receipts Report).  Between August 28 and September 15 of 2004, Exousia transported 16 big game hunting groups with a total of 48 people within Noatak National Preserve. Exh. 18 (Big Game Transport Reports).

Craig Schweitzer, who testified at the trial, is the president and an officer of Exousia. Mem. Op. at 3.  He owns more than 50 percent of the shares of the corporation. Tr. 2-94.  He has been flying with Exousia since 1998. Mem. Op. at 11.  Craig Schweitzer signed Exousia's application for an Incidental Business Permit for 2004-2005, as an "owner". Exh. 17 at 8.  He is also the only person listed on this application under persons authorized to provide pilot services for the company. *Id.* at 2.

The National Park Service permit required Exousia to operate in compliance with all pertinent Federal, State and local laws and regulations. Mem. Op. at 2; Exh. 16 at 3. The State of Alaska regulation for the Noatak CUA is a pertinent state regulation. Mem. Op. at 2. Judge Roberts found that on September 1, 2004, Craig Sweitzer flew a party of four game hunters to an unnamed lake ("Lake 35") within the Noatak National Preserve in one of the corporate planes. Mem. Op. at 3. Mr. Schweitzer told the hunters that he thought he could find a spot for them to hunt caribou. Mem. Op. at 4. On the September 1, 2004 flight, Mr. Schweitzer carried with him the aeronautical map mandated by the FAA, Exhibit C. Mem. Op. at 11. He landed the airplane on Lake 35. Mem. Op. at 4. Judge Roberts found that Mr. Schweitzer made no credible effort to determine in advance of landing whether Lake 35 was inside or outside the Noatak CUA corridor. Mem. Op. at 12.

Henry Corning was one of the hunters and paid Mavrik Aire for the group for transportation from Kotzebue to the hunting grounds and back. *Id.* at 3. Mr. Corning came to court from California pursuant to a subpoena doing his duty as a citizen. Tr. 1-14. He testified that he and his hunting companions made camp by a corner of Lake 35. Mem. Op. at 4. He took the photograph of Lake 35 shown in Exhibit 3. Mr. Corning brought with him the Alaska Hunting Regulations Booklet. Exh. 15. He also had with him a Global Positioning Systems

("GPS") unit. Mem. Op. at 4. Mr. Corning entered a "waypoint" on his GPS from his hunting camp. Mem. Op. at 6.

On September 5, 2004, National Park Service Rangers Kean Mihata and Dan Stevenson went to Mr. Corning's hunting camp as part of their duties as law enforcement rangers. Mem. Op. at 6. They arrived by helicopter and performed a general welfare check and determined that the hunters' licenses were in order. *Id.* It was a clear, sunny day. *Id.* Ranger Mihata took the photograph of Lake 35 shown in Exhibit 4.

Before he left, Ranger Mihata used his GPS and recorded a waypoint. Tr. 1-58. Ranger Mihata estimated that he was approximately 125 yards south of Mr. Corning's hunting camp at the time. Tr. 1- 57-58. There was nothing obstructing his GPS receiver. Tr. 1-57. Ranger Mihata took a photograph of what his GPS receiver showed at this location. Exh. 7; Tr. 1 - 56-7. Ranger Mihata also gathered information on three points along the north side of the Noatak River with his GPS, taking the points from a helicopter hovering three to four feet off the ground. Tr. 1-59. Ranger Mihata returned the following day and observed the Exousia aircraft land on the lake and pick up the hunters. Mem. Op. at 7. Sometime during the following ten days, while on a boat patrol in the Noatak River, Ranger Mihata entered two waypoints (positions) into his GPS at the mouth of Sapun Creek. *Id.*; Tr. 1-59.

· Ranger Mihata put the data into a computer back at his office. Tr. 1-64. Using his Garmin software, Ranger Mihata determined that the unnamed lake was about 2-3 miles south of the North side of the Noatak River and west of Sapun Creek. Mem. Op. at 7; Tr. 1-65. He spoke with other law enforcement rangers regarding the facts and then issued a violation notice to Exousia. *Id*. Subsequently, Ranger Mihata provided all of the information gathered with his GPS receiver to Joel Cusick. Tr. 1-64; 1-110.

Joel Cusick works for the National Park Service in Alaska as a Geographic Information System (GIS) Specialist and GPS Coordinator. Tr. 1-97. At trial, he testified as to the GPS data and as to various exhibits he created using this data, and to rebut Exousia's claims. This trial was the first time Mr. Cusick testified in a court proceeding. Tr. 2-14. His resume is set forth as Exhibit 11. Mr. Cusick takes digital maps of different formats and uses them to construct new maps for park resource management personnel. Tr. 1-101. He explained: "generally, the base maps are provided by others, then I make the GPS data that sits on top of it and make sure they coincide correctly and accurately." *Id*. Mr. Cusick is president of the Alaska Arc User Group, which is a GIS user group. Tr. 1-100.

As the GPS Coordinator, Mr. Cusick teaches National Park Service personnel how to use GPS receivers. Tr. 1- 98-9. He is one of only two persons in the State of Alaska certified to teach use of a mapping grade GPS receiver manufactured by Trimble. Tr.1-98. Mr. Cusick has also tested the accuracy of

recreational grade GPS units extensively and has authored papers and given professional presentations on GPS accuracy and other topics. Tr. 1-99. Mr. Cusick explained how a person holding a GPS receiver can calculate or pinpoint his or her position on the surface of the earth within approximately ten meters through the assistance of various satellites orbiting the earth broadcasting a timed digital signal. Tr. 1-97. He also described the accuracy of GPS generally, including developments during the past few years that improved the accuracy of recreational level GPS receivers. Tr. 1-104.

On August 31, 2005, Mr. Cusick and Ranger Mihata gathered additional information presented at trial. Mr. Cusick took the photo of Lake 35 and the Noatak River shown on Exhibit 5 from a helicopter. Tr. 1-118. Mr. Cusick and Ranger Mihata walked along the north and south sides of the bank of the Noatak River respectively. Each carried a mapping grade GPS receiver manufactured by Trimble that is accurate to 1 meter. Tr. 1-98. Their GPS receivers recorded a position every 5 seconds, generating a line of where they walked. Tr. 1-116.

Mr. Maw, who testified at trial as an expert for Exousia, went to the area on September 14, 2005 and made several observations both from the air and on the ground. He gathered GPS information and had aerial photographs taken. Mr. Maw was admitted as an expert in GPS use, map use and interpretation and in borders and shores interpretation and resolution. Tr. 2-114. He has 27 years experience as an instructor in the Department of Environmental Science at

Appellee's Brief                                      10
Case No. A05-0121CR (JWS)

Lethbridge Community College in Lethbridge, Alberta and a wide assortment of other experience. See Exhibit G (Resume).

Park Ranger Dan Stevenson testified as a rebuttal witness. He has been at Western Arctic Parklands for 6 years and supervises the other law enforcement rangers there. Tr.2-173. He is also a pilot with a commercial license and has flown and been flown in the area many times. Tr. 2- 174-5.

### 2. The Location of Lake 35 vis a vis the Noatak River

Lake 35 is shown on the United States Geological Survey ("USGS") Baird Mountains 1:250,000 map, Exhibit 1, immediately to the right of the letter "O" in National. Mem. Op. at footnote 1. It appears on the USGS Baird Mountains D-3 1:63:360 map, Exhibit H, in Section 35 of Township 29 North, Range 8 West.

With regard to the waypoint obtained by Ranger Mihata by Mr. Corning's campsite, Mr. Cusick explained that the photograph taken by Ranger Mihata, Exhibit 7, showed that the GPS receiver estimated its accuracy to 17 feet. Tr. 1-106-107. He opined that this number was a good estimate of the accuracy of the unit at the time from both his experience and the documented experience of others. Tr. 1-107. He also opined that the GPS used by Ranger Mihata was generally accurate to at least 10 meters, which is roughly 39 feet. Tr. 2-10. Mr. Cusick later confirmed the accuracy of Ranger Mihata's waypoint by the unnamed lake when he entered both the position recorded by Mr. Corning and

that recorded by Ranger Mihata on to a Garmin map, as shown in Exhibit 9. Tr.
1-121.

Mr. Cusick also created several exhibits showing Ranger Mihata's GPS

data from 2004 as well as the Noatak River GPS data gathered in 2005. Exhibits 6,

8. 10. Exhibits 6 and 10 used USGS maps, and Mr. Cusick testified that he let the

GPS data fall where it lays on the USGS maps, without moving the USGS map.

Tr. 2-12. Exhibit 8 by entering Ranger Mihata's data on to a map provided by

Garmin Corporation through proprietary software called MapSource Topo. Tr. 1-

109-110. Mr. Cusick did not alter that map in any way when he made exhibit 8.

Tr. 1- 110-11. Mr. Cusick determined the distance from Ranger Mihata's

waypoint by the unnamed lake to the south bank of the Noatak River to be 1.50

miles, as shown by the Straight Line Distance on exhibit 10. Tr. 1-123. Judge

Roberts accepted this evidence, Mem. Op. at 9, and Exousia has not challenged it

on appeal.

### 3. Lake 35 vis a vis the Eastern Boundary of the CUA.

#### a. General Background

Exousia's defense in this case is that there is confusion as to the location of

the mouth of Sapun Creek and the boundary lines of the CUA. *See* Tr. at 2-53.

Judge Roberts rejected this argument. Any confusion of Craig Schweitzer

resulted from his failure to make a credible effort to determine whether Lake 35

was within the CUA. *See* Mem. Op. at 12. Judge Roberts found that Mr.

Schweitzer did not act reasonably in relying on the FAA map and, to the extent

he viewed it, on the GPS display he provided at trial. Mem. Op. 12-13. Judge

Roberts found that it was clear beyond a reasonable doubt that Lake 35 is within

the boundaries established for the CUA based on several maps and the testimony

of the prosecution witnesses. Mem. Op. at 16. As Judge Roberts held, there is no

real confusion, just a lack of effort to determine the boundary by Craig

Schweitzer. Mem. Op. at 12-13.

The effort necessary to determine that Lake 35 is within the CUA is

minimal. Henry Corning testified that Sapun Creek was not shown on the map

that comes up in the viewing screen of his GPS. Tr. 1-35. Nevertheless, his GPS

reading led him to believe that they might be within the CUA, particularly

because they were downstream of Sapun Creek. Mem. Op. at 6; Tr. 1-33 and 1-35.

He stated:

> the Noatak has its own little calligraphy on the landscape and its
> own wiggles, and if you compared the wiggles on my GPS to the
> wiggles on the Fish and Game map, we were in the exclusion zone.

Tr. 1-35.

He asked Ranger Mihata if there was a problem because he thought:

> the shape that the Noatak draws on the earth is just like your
> signature or mine, and based on that – based on that little dot that
> the GPS gives you, I had a pretty good idea why that helicopter
> was landing.

Tr. 1-36.

Appellee's Brief                          13
Case No. A05-0121CR (JWS)

Moreover, all of the maps in this case show Lake 35 to be situated west of where Sapun Creek enters into the Noatak River. As explained by Judge Roberts in his Memorandum Opinion:

> . . . the maps show that Sapun Creek enters into the Noatak River east of Lake 35 where the hunting party was dropped. The U.S.G.S. Baird Mountains 1:250,000 map, Exhibit 1, shows the lake immediately right of the "O" in National, in Township 29 North, Range 8 West. It shows Sapun Creek entering into the Noatak River within Township 29 North, Range 7 West.
>
> The U.S.G.S. Baird Mountains D-3 1:63,360 map, Exhibit H, shows the lake more specifically in Section 35 of township 29 North, Range 8 West. It shows Sapun Creek entering into the Noatak River in Section 19 of Township 29 North, Range 7 West.
>
> The unnamed lake is also shown on the Garmin map used in Exhibit 8 to be at least one and a half miles, directly west of where Sapun Creek enters into the Noatak River. Lake 35 is also known as the "unnamed lake" shown well west of the mouth of Sapun Creek on other Garmin GPS maps used in this case; See Exhibits D, 26, 27 and C.
>
> Mem. Op. at 16. (Additional spacing added for clarity).

    b.  <u>The Mouth of Sapun Creek</u>

Sapun Creek is a stream in the Baird Mountains that flows northwest 16 miles to the Noatak River, eleven miles east of its junction with Nakolik River, 64 miles north of Kiana. Mem. Op. at 12, citing the Dictionary of Alaska Place Names, 1971 edition. It is sufficiently well known by the community that the State Board of Fish and Game used it for the eastern boundary of the CUA. Sapun Creek drains a major watershed and is deep and long in contrast to Kanayat Creek. Mem. Op. at 15-16. Moreover, the Noatak River makes a

Appellee's Brief          14
Case No. A05-0121CR (JWS)

pronounced turn to the north at its confluence with Sapun Creek. Mem. Op. at 17.

Judge Roberts also found that the channels of Sapun Creek are easily seen and identifiable from the air. Mem. Op. at 12. Most people would understand "Sapun Creek" to refer to the watercourse as easily seen or determined. This is typically referred to as the ordinary high water mark. Alaska law pertaining to forest resources and practices defines the "ordinary high water mark" as:

> **the mark along the bank or shore** up to which the presence and action of the tidal or nontidal water are so common and usual, and so long continued in all ordinary years, **as to leave a natural line impressed on the bank or shore** and indicated by erosion, shelving, changes in soil characteristics, destruction of terrestrial vegetation, or other distinctive physical characteristics.

A.S. §41.17.950(15) (emphasis added).[2]

Kean Mihata testified that he understood the mouth of a creek to be where the water leaves the creek and enters into another body of water. Tr. 1-67. He stated that when he took his GPS waypoints for the mouth of Sapun Creek:

> I looked at the mouth of the creek there, which is fairly braided and kind of extends at a wide area, and used that - - those edges of that braided area to make the determination.

Tr. 1-84. He explained that he considered the braided area to be where water was flowing when he was there. *Id.*

---

[2] The U.S. Supreme Court has stated that a river boundary is the ordinary high water line. See *Howard v. Ingersoll*, 54 U.S. 381 (1851), discussed in Waters and Water Rights, vol. 1 at 6.03(a)(2) (LexisNexis, 1991 edition, 2001 replacement volume).

Ranger Mihata's approach is consistent with the dictionary definition of "mouth" used by Judge Roberts in denying the motion to dismiss. Order re Mtn to Dismiss at 10. Every creek has two sides, or banks. As pointed out by Appellant, the State Board of Fish and Game has defined a stream mouth in the sport fishing regulations as:

> the downstream point defined as a straight line running from the most downstream extremity on the one streambank to the most downstream extremity on the other streambank, or a point defined and marked by the department.

5 AAC § 75.995(27). Appellant claims that Sapun Creek empties into the Noatak River on only one side giving only one point, so that a straight line cannot be drawn. Exousia Br. at 20. This makes no sense, because Sapun Creek, like any other watercourse, has a width to it.

In contrast, Craig Schweitzer testified that could not determine where Sapun Creek entered into the Noatak River. He claimed that the FAA map, exhibit C, was not helpful because it does not label a "Sapun Creek". Mem. Op. at 11. Mr. Schweitzer testified that there is a particular stream in the area that could be Sapun Creek. Tr. 2- 66-69. As support for this claim, Mr. Schweitzer referred to Exhibit D, a photograph of a particular setting on the GPS within his airplane. This photograph was taken while the airplane was on the ground in Kenai, Alaska. Tr. 2-67. Craig Schweitzer he did not testify that this was what his GPS displayed when he flew Mr. Corning and his companions, or even that he

commonly has his airplane GPS set to show this particular level of detail. See Tr. 2- 66-69.

Exhibit D shows two streams and a label "Sapun Creek" appearing across both Sapun Creek and the unnamed streams. Mem. Op. at 12.   In his rebuttal testimony, Mr. Cusick explained the disingenuous way this GPS display was generated.  He explained how the size of the label "Sapun Creek" could be made to change on the display, and also how the GPS unit displays information on particular features that are chosen. Tr. 2-185-7.  Mr. Cusick generated the top photograph of exhibit 27, which is a photograph of a GPS display very similar to the one shown in Exhibit D,  by "clicking" or selecting what he understands to be Sapun Creek. Tr. 2-186.  This resulted in the GPS displaying the label "Sapun Creek" only, with no label for the no-name stream to the west.  The bottom photograph in Exhibit 27 shows what happened when Mr. Cusick selected the no-name stream to the west of Sapun Creek.  In this case, the GPS display did not show any label for Sapun Creek, but did show the label "stream" touching Sapun Creek.  Exhibit 26 shows additional photographs taken of the same GPS, with additional detail that clearly indicates Sapun Creek.  This same information and level of detail was available on the GPS used by Mr. Schweitzer, as Mr. Cusick determined the two GPS units contain the identical maps. Tr. 2-188.

The no-name stream referred to by Mr. Schweitzer appears to the one shown on the USGS 1:63,360 map, exhibit H, in sections 36, 25 and 24 of

Appellee's Brief                                17
Case No. A05-0121CR (JWS)

Township 29 North, Range 8 West, that Judge Roberts describes as "an unnamed stream coming from the Angayukalik Hills to the west of Sapun Creek and its source" Mem. Op. at 10. Joel Cusick and Ranger Dan Stevenson both pointed out that this stream drains a much smaller area than Sapun Creek and is not very long in comparison. Tr. 2-5 and 2- 179-180. Ranger Stevenson had no trouble identifying Sapun Creek on the FAA map, Exhibit C, although he had to use a magnifying glass to view the label attached to it (Kanayat Creek).[3] Tr. 2-181. He does not carry a magnifying glass with him when he flies as a pilot. *Id*. The FAA map shows lots of rivers, streams, creeks, and other features without labels. It even shows Lake 35 to the west of Sapun Creek. Exh. C.

Mr. Stevenson also testified that Sapun Creek is easily recognizable where it enters into the Noatak River for several reasons. One is that the Noatak River takes a decided turn to the north at its confluence with Sapun Creek. Tr. 2-178. The Noatak River's turn to the north can be clearly seen on one of the photographs provided by Defendant, as well as on the FAA map, the Alaska Hunting Regulations booklet and the USGS 1:63,360 map, exhibits B, C, F and H respectively. Another reason is that Sapun Creek drains a major watershed and is very deep and long. Yet another reason is that there is a landing strip south of

---

[3] Kanayat Creek is a stream that flows northwest ten miles to Sapun Creek, six miles south of its junction with the Noatak River. Mem. Op. at 12, citing Dictionary of Alaska Place Names (1971 ed.).

Appellee's Brief                    18
Case No. A05-0121CR (JWS)

the Noatak River adjacent to the east side of Sapun Creek where Sapun Creek

enters into the Noatak River, shown on Exhibit B. Tr. 2-175. Ranger Stevenson

testified that the gravel bar is a pretty well known airstrip:

> It's been used by pilots in the area for numerous years because it's
> just above the general understanding of the controlled use area. So
> pilots will land there with wheeled aircraft . . . to drop off hunters,
> which they're legally allowed to do because they are above Sapun
> Creek. And that is the understanding of most local pilots and
> transporters in the area.

> Tr. 2-176.

Judge Roberts was not convinced by Craig Schweitzer's testimony. He

observed:

> Even if he obtained such a GPS reading it was not reasonable to
> think that the Sapun Creek constituted both water streams on the
> map. Moreover, using a Garmin GPS map 396 and placing the
> mouse (pointer) on the first stream, the readout reflects "stream."
> Placing the pointer on the second waterline, it reflects "Sapun
> Creek." See, Exhibits 26 and 27. Both sets of GPS maps show two
> separate creeks which do not merge. It would not be reasonable to
> assume that both of these creeks from different sources are named
> Sapun Creek. Any doubt as to how to read that map would cause a
> reasonably prudent person to look for other sources to ascertain the
> exact location of Sapun Creek.

> Mem. Op. at 13. Footnote omitted.

Mr. Maw pointed out that the USGS maps, Exhibits 1 and H, might not be

accurate. One reason was that these USGS maps were not field-checked. Tr. 2-

115. Another reason was that features on the background maps such as rivers

and streams may shift or otherwise change. Ranger Mihata testified that he uses

the USGS maps in the field and that he has never found it inaccurate. Tr. 1- 72-3.

He has been in the vicinity of where Sapun Creek joins the Noatak River

anywhere from five to ten times a year for patrol and wildlife surveys, traveling

there by boat, airplane and helicopter. Tr. 1-71. He has not seen any changes in

Sapun Creek from his observations between May of 2003 to the end of

September, 2005. Mem. Op. at 8.

Mr. Maw testified that the USGS maps do not give an accurate picture of

the mouth of Sapun Creek as he witnessed it. However, the two photographs

taken pursuant to instructions from Mr. Maw, Exhibits A and B, show that the

USGS maps depict Sapun Creek accurately. Exhibit A shows that Sapun Creek

has distinct channels, or "fingers" where it enters into the Noatak River. All of

these channels begin close to where Sapun Creek flows into the Noatak River,

east of an S curve in Sapun Creek. Mr. Maw testified that Exhibit A was taken

while standing in section 30, at a location that would be somewhere between the

N and A in the word National on the USGS 1:63,360 map, Exhibit H. Tr. 2- 126-7.

A review of this quadrangle map indicates that the S curve shown in the first

photo (Exhibit A) is located in section 19 of the USGS map and extends south

into section 30. The two lakes shown in the photo also appear in section 19, just

north of the Noatak River. Looking at both the photo and the USGS map, the

channels of Sapun Creek all are located east of the S curve, and would be located

in section 19. Since the unnamed lake is located entirely within section 35, the

unnamed lake is still within the Noatak Controlled Use Area because it is west of section 19.

The photograph shown on Exhibit B shows the course and defined, deep channels of Sapun Creek from a different angle and scale. Mr. Maw testified that the photo was taken from the bottom corner of section 25. Tr. 2-127. Section 25 is east of the unnamed lake, which is located entirely within section 35. Looking at the USGS map that is Exhibit H, this photograph shows Sapun Creek in section 19 and a greater portion of section 30 (Sapun Creek is shown smaller, and more of it appears in this photo than in photograph A). The course of Sapun Creek as shown in this photograph is also consistent with the course of Sapun Creek as shown on the USGS map at the 1:250,000 scale, exhibit 1. The photograph does not raise any doubts that the unnamed lake where the Defendant took Mr. Corning was west of the mouth of Sapun Creek. Mr. Schweitzer did not testify about these aerial photographs of Sapun Creek.

The "braided areas" referred to by both Mr. Schweitzer and Mr. Maw are quite different than the channel of Sapun Creek as shown in Mr. Maw's photographs in Exhibits A and B. Both photos indicate that Sapun Creek has defined channels easily seen and identifiable from the air. In contrast, Mr. Maw stated in cross-examination that he did not see water in the "braids" in section 24. Tr. 2-157. Mr. Maw stated that it was his opinion that the waters of the creek are mixing with the water in the lower portion of section twenty-four . Tr. 2- 156.

Appellee's Brief                         21
Case No. A05-0121CR (JWS)

"once those waters mingle, it is quite conceivable that some of that water is going to end up over in section twenty-three." 2 - 156-7. Mr. Maw did not see actually observe any water flowing from Sapun Creek into those areas. Tr. 2-157.

Mr. Maw he described the braided area as identifiable by lack of willows and other sort of shrubs. Tr. 2- 168-9. He further described the braids as having a very thin veneer of some sedges and moss. Tr. 2-169. He opined that water prevented the establishment of willows and shrubs into these areas, most likely due to a build up of ice during the winter that subsequently scours the ground and keeps vegetation from re-establishing itself and results in water flowing in during spring run-off and spring rains. *Id.*

What Mr. Maw described is not typically considered to be a part of a watercourse such as a stream, as evidenced by *Weinberg v. Northern Alaska Development Corporation*, where the Alaska Supreme Court held:

> the evidence showed that normally water flowed through the slough only during the spring thaw and on infrequent occasions during the summer months when there were heavy rains. Such periodic flow is not of such frequency or duration as to make it practicable to classify the slough as a watercourse. Instead, it must be classified as a drainway for surface waters i.e., waters from melting snow or rain which flow on the surface of the earth but do not form part of a watercourse.

384 P.2d 450, 451 (Alaska 1963) (footnotes omitted).

Judge Roberts rejected Mr. Maw's opinion that water from Sapun Creek could end up in Section 23 before it reaches the Noatak River as conjecture, unsupported by the evidence. Mem. Op. at 15. He also stated "Sapun Creek

Appellee's Brief                    22
Case No. A05-0121CR (JWS)

braids at its juncture with the Noatak River but no credible evidence extends those braids downstream past Lake 35." Mem. Op. at 16. He found: "Exhibit B makes clear that the mouth of Sapun Creek, however wide it may be, is well upstream on the Noatak River where the river bends northward as shown in Section 19 of the D3 map. Mem. Op. at 14. Judge Roberts also found:

> According to the maps, water from the unnamed creek flowing through Section 25 is not mixed with waters in Sapun Creek, at least in any meaningful way to call the unnamed stream a branch of Sapun Creek.

> Mem. Op. at 15.

c.  The Eastern Boundary line.

The plain language of the regulation makes clear that the eastern boundary of the CUA extends five miles from the mouth of Sapun Creek. It is not necessary that the State of Alaska explain how the five miles is to be measured. Appellant pointed out that Mr. Cusick's measurements do not represent the true distance because they are straight line (line of sight) measurements as opposed to actual ground miles that take into account the actual terrain of the ground. Exousia Br. at 7. As stated by Judge Roberts, interpreting the "five miles" as being calculated by considering the actual walking distance, i.e. the contours and topography:

> would pose an unwary and unwarranted trap for hunters and persons or entities transporting hunters . . . because one would have to guess at the actual measurement at numerous locations where the land has not been surveyed.

Appellee's Brief                                    23
Case No. A05-0121CR (JWS)

Mem. Op. at 17.

Common sense indicates that the five mile distance be the shortest distance to the mouth of Sapun Creek. During trial, Mr. Cusick explained that the shortest distance to a line is determined by measuring the distance of a straight line at a perpendicular angle. [4] Thus the eastern boundary line would extend at an angle perpendicular to the mouth of Noatak River. This is consistent with the general shape and the angle of the boundary line as depicted on the State of Alaska's website and hunting booklets, Exhibits 2, 15 and F. The eastern edge of the CUA shown on this map is not entirely consistent with that shown on the Alaska hunting regulations booklet, however the discrepancy can be explained somewhat by the different scales of the two maps. Mem. Op. at 6. Ranger Mihata testified that he is familiar with the Alaska Hunting Regulations Booklet (exhibits 15 and F). When asked whether he determined the location of the eastern boundary line, Ranger Mihata stated: "I don't have to determine the entire line for this case." and explained that he had determined that the lake was west of the mouth of Sapun Creek. Tr. 1-88.

Although not stated, Exousia's claim that Lake 35 is outside of the CUA is premised on the possibility that the eastern boundary line could be angled along

---

[4] Tr. 2-8. Mr. Cusick testified further that this was depicted on Exhibit 10 by the "Shortest Distance" line showing the shortest distance to the south bank of the Noatak River (1.5 miles) *Id*.

the magnetic north/south line, even though this is not what is depicted in the

State of Alaska map or hunting pamphlets, exhibits 2, 15 and F.  Mr. Maw

observed Lake 35 to be outside the CUA when he had the pilot fly a "due south"

course when passing over a portion of the Sapun Creek braiding, noting that

there was further braiding to his right. Exousia Br. at 10, citing Tr. 2-134-142.

During the trial, it was clear that Mr. Maw was referring to due south as shown

on the pilot's compass. Tr. 2-140-1.  On direct examination of Mr. Maw, Counsel

for Exousia referred to it as "a magnetic north-south heading" Tr. 2-141.  Mr.

Maw further clarified that the due south heading was a magnetic measurement

during Voir Dire. Tr. 2-172.

The direction of a line drawn along a magnetic north/south axis varies

from the direction of a line drawn along a true north/south axis.  The common

understanding, which provides the plain meaning, of the word north is pointing

to the north pole.  This is true north.  Magnetic north is the direction of the

northern of two nonstationary regions on the earth which sometimes move many

miles in a day, toward which the isogonic lines converge, and at which the dip is

plus or minus 90 degrees. See Webster's Third New International Dictionary

Unabridged, 1986. p. 1359.  The USGS quadrangle map provided by the

Defendant shows that magnetic north is 22 degrees east from true north. Exh. H.

The FAA map, exhibit C, indicates that magnetic north is 19 degrees east of true

north in the vicinity of Sapun Creek through a dashed purple line extending

from top to bottom of the map that is located left of the unnamed lake and Sapun

Creek.[5]

## F.  STANDARD OF REVIEW

The district court's post-conviction review of a magistrate judge's

judgment is governed by the same standards as an appeal to the court of appeals

from the judgment of the district court. 18 U.S.C. 3402; *see also United States v.*

*Fautanu*, 751 F.Supp. 1420 (D. Ha. 1990) and *United States v. Ramirez*, 555 F. Supp.

736, 739 (E.D. Cal. 1983).  Thus, an appealed from conviction is overturned only if

clearly erroneous or contrary to law.

## G.  ARGUMENT

### 1.  The Evidence is Sufficient to Convict Exousia.

Appellant contends that Judge Roberts erred in determining beyond a

reasonable doubt that Lake 35 is located within the Noatak CUA. Exousia Br. at

11, 18-19. Appellant claims that "it cannot be ascertained beyond a reasonable

doubt that the lake is within the restricted area" unless the entire eastern

boundary is ascertained, and that the testimony of witnesses from the State of

Alaska was necessary to make this determination. Exousia Br. at 19.  This

---

[5] Mr. Cusick stated: "true north is typically how landlubbers or USGS map products are aligned, and true north points to generally the top of the map; points to the celestial pole as opposed to the magnetic pole." Tr. 1-124.

Appellee's Brief                          26
Case No. A05-0121CR (JWS)

amounts to a claim that there was insufficient evidence to support the conviction.[6]

There is sufficient evidence to support a conviction if, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Atkinson*, 990 F.2d 501, 503 (9th Cir. 1993), quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Moreover, the reviewing court must respect the exclusive province of the trier of fact to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts. *United States v. Ginn*, 87 F. 3d 367, 369 (9th Cir. 1996).

Based on the totality of the testimony and evidence described above, it is clear that any trier of fact could rationally conclude that Lake 35 is within the Noatak CUA. The lack of a definition of "mouth" or "creek" in the regulation does not create reasonable doubt. As Magistrate Judge Roberts explained:

> It may be unsettled as to the width of the mouth of Sapun Creek as it enters the Noatak River, but such uncertainty does not lead to reasonable doubt that the unnamed lake in Section 35 falls within the CUA. The defendant has not produced any more accurate GPS readings that either call into question the readings relied upon by

---

[6] Appellant did not move for acquittal at the close of the prosecution's case. See Tr. 2- 51-2. However, the Ninth Circuit has held that a motion for acquittal is not necessary in a bench trial in order to preserve for appeal a challenge to the sufficiency of the evidence. *United States v. Atkinson*, 990 F.2d 501, 503 (9th Cir. 1993).

the government or cast a doubt as to which stream is called Sapun Creek forming the easterly boundary of the CUA. According to the maps, water from the unnamed creek flowing through Section 25 is not mixed with waters in Sapun Creek, at least in any meaningful way to call the unnamed stream a branch of Sapun Creek. Mr. Maw's opinion that water from the Sapun Creek could end up in Section 23 before it reaches the Noatak River is unsupported by the evidence. I reject that suggestion as conjecture.

Mem. Op. at 14-15.

In reaching his conclusion, Judge Roberts stated that he was persuaded by

the maps and the prosecution's witnesses. Mem. Op. at 16-17. He rejected Mr.

Maw's opinion and he found that Craig Schweitzer did not act reasonably. Mem.

Op. at 12 -13; *see also supra* at 16-19.

> **2. The Noatak Controlled Use Area regulation is not void for vagueness as applied to Exousia's conduct because it describes the eastern boundary with sufficient clarity to put Exousia on notice that its conduct was prohibited.**

Exousia's first and third arguments amount to a claim that the Noatak

CUA regulation that is the predicate for the federal violation for which it has

been convicted is unconstitutionally void for vagueness. First, Exousia claims

that the mouth of Sapun Creek must be preciously located (Exousia's phrase) by

a properly authorized entity and/or individual in order to have the certainty

required of a penal statute because the regulation itself does not define the

boundaries of the prohibited area, the beginning and end of which are the

mouths of rivers and/or streams, in plainly discernable navigation standards.

Exousia Br. at 15 and 11-18. Subsequently, Exousia claims that the description of the CUA set forth in the regulation does not provide adequate notice. *Id.* at 19-22.

The constitutionality of a statute is a question of law reviewed de novo. *United States v. Williams*, 441 F.3d 716, 724 (9th Cir. 2006), *citing United States v. Carranza*, 289 F.3d 634, 643 (9th Cir. 2002). Outside the context of the First Amendment where facial challenges may be permitted, as a general rule the necessary and proper focus of a void-for-vagueness challenge is whether the statute is impermissibly vague **under the facts of the particular case**. *Rojas-Garcia v. Ashcroft*, 339 F.3d 814, 822 (9th Cir. 2003) (emphasis added), *citing United States v. Purdy*, 264 F.3d 809, 811 (9th Cir. 2001). A statute is void for vagueness if, as applied to the facts of the case, the statute 1) does not define the conduct it prohibits with sufficient definitiveness and 2) does not establish minimal guidelines to govern law enforcement. *Rojas-Garcia*, 339 F.3d at 822 (citation and quotation omitted).

    a. <u>A person of average intelligence could easily determine that Lake 35 is within the boundaries of the Noatak Controlled Use Area.</u>

In examining a statute for vagueness as applied, a court must determine whether a person of average intelligence would reasonably understand that the charged conduct is proscribed. *Williams*, 441 F.3d at 724. Contrary to Exousia's argument, it is not necessary for the State of Alaska to specifically set or mark the location of the boundaries with navigational precision in order for a person of

average intelligence to determine that Defendant's conduct at Lake 35 occurred

within its boundaries. The Noatak CUA regulation defines the CUA as:

> the area consists of that portion of Unit 23 in a corridor extending
> five miles on either side of, and including, the Noatak River,
> including the river, beginning at the mouth of the Noatak River,
> and extending upstream to the mouth of Sapun Creek;

These words are not obscure words that require special skill in

interpreting. Rather, as discussed above, they are easily understandable by

people of ordinary intelligence. See discussion *supra* at 14-16.

Constitutional due process does not require that citizens be provided

actual notice of all criminal rules and their meanings, and may be satisfied if the

necessary information is reasonably obtainable by the public. *United States v.*

*Vasarajs*, 908 F.2d 443, 449 (9th Cir. 1990). Judge Roberts found that Mr.

Schweitzer "made no credible effort to determine in advance of landing whether

Lake 35 was inside or outside the corridor." Mem. Op. at 12. Furthermore, with

regard to the GPS display that Mr. Schweitzer testified about at trial, Judge

Roberts stated:

> Even if he obtained such a GPS reading it was not reasonable to think that
> Sapun Creek constituted both water streams on the map. . . . Any doubt as
> to how to read that map would cause a reasonably prudent person to look
> for other sources to ascertain the exact location of Sapun Creek.
>
> Mem. Op. at 13.

Probably the most telling opinion came from the person who has the least

actual knowledge of the area. Mr. Corning was only in the area of the unnamed

Appellee's Brief    30
Case No. A05-0121CR (JWS)

lake for 4 days, and had never been there previously. Tr. 1-45. He did not have

the U.S.G.S. map with him. However he believed that the unnamed lake is west

of where Sapun Creek enters into the Noatak River. See discussion *supra* at 12-13;

see also Mem. Op. at 6. Mr. Corning's testimony concerning his relative ease of

realizing that the camp location was within the CUA is not challenged or

addressed by Exousia.

A person of average intelligence would be surprised to hear that Mr. Maw

considered Sapun Creek to encompass the waters in section 24. As discussed

above, that argument strains credibility and is contrary to the common

understanding of a creek or stream as being defined by its visible channels and

bank. See discussion supra at 20-23. Judge Roberts found that this claim was not

supported factually:

> According to the maps, water from the unnamed creek flowing
> through Section 25 is not mixed with waters in Sapun Creek, at
> least in any meaningful way to call the unnamed stream a branch of
> Sapun Creek.

Mem. Op. at 15.

There is no question that Lake 35 is within the CUA if true north, the basis

for all topographic maps, is used as the basis for analysis. Defendant's

suggestion that the eastern boundary line could be along a magnetic north/south

angle is not a reasonable interpretation of the regulation. It goes against

common understanding that boundaries are set with reference to true north

rather than the shifting magnetic poles of the earth. Had the State of Alaska

Board of Fish and Game intended that the reference points be the magnetic poles, they would have had to provide for this in enacting the regulation.

      b.   <u>Exousia does not have standing to challenge the Noatak CUA Regulation as to any uncertainty concerning the Eastern Boundary.</u>

      Thus, based on the facts established at trial, even if there could be a question as to the exact location of the boundary of the Noatak Controlled Use Area, Exousia would not be in a position to challenge it. The U.S. Supreme Court has held that one who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others. *Hoffman Estates, Inc. v. The Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 495, 102 S.Ct. 1186, 71 L. Ed. 2d 362 (1982). *See also Parker v. Levy,* 417 U.S. 733, 755, 94 S.Ct. 2547, 41 L.Ed. 2d 439 (1974). Although there may someday be a case where a question as to the exact location of the mouth makes a difference, this case is not it.

      Nevertheless, Exousia contends that this court must invalidate the Noatak CUA regulation because it contains some ambiguity as to the eastern boundary, citing to the Alaska Supreme Court decision in *State v. Bernard,* 625 P.2d 311 (Alaska 1981) (per curiam) (Rabinowitz dissenting). Exousia Br. at 20. In *Bernard,* Petitioners were charged with keeping crabs that were too small, in violation of a state regulation requiring a minimum size. *Id.* at 313. **The evidence showed that the crabs met the minimum size requirement when measured in a particular way.** (Emphasis added). The Alaska Supreme Court, per curiam, interpreted the state regulation in favor of the petitioners after determining that the regulation

was capable of two or more equally logical interpretations. In holding that the ambiguity must be strictly construed in favor of the Defendant, the Alaska Supreme Court applied the rule of lenity to determine the law.

The rule of lenity is a corollary to the vagueness doctrine, used "to restrict criminal statutes to conduct clearly covered by those statutes." *United States. v. Wyatt*, 408 F.3d 1257, 1260 (9th Cir. 2005), *quoting United States v. Hockings*, 129 F.3d 1069 (9th Cir. 1997). Thus in criminal proceedings where the rule of lenity is applied, its application allows a court to find that the criminal statute is not void for vagueness. Under the rule of lenity, when a criminal statute is ambiguous, courts interpret the statute in favor of the defendant. *Wyatt*, 408 F.3d at 1262.

Exousia's reliance upon the rule of lenity applied in *Bernard* is misplaced. The U.S. Supreme Court has rejected the contention that the rule of lenity is invoked merely because a different reading of the statute is possible, stating:

> Because the meaning of language is inherently contextual, we have declined to deem a statute 'ambiguous' for purposes of lenity merely because it was possible to articulate a construction more narrow than that urged by the government . . . . Instead, we have always reserved lenity for those situations in which a reasonable doubt persists about a statute's intended scope even after resort to 'the language and structure, legislative history, and motivating policies' of the statute.

*Moskal v. United States*, 498 U.S. 103, 108, 112 L.Ed.2d 449, 111 S.Ct. 461, 465 (1990) (citations omitted). *See also United States v. Wyatt*, 408 F.3d at 1262. When ruling upon the constitutionality of a state statute, a federal court "may only consider the statute's plain meaning and authoritative state court

Appellee's Brief                          33
Case No. A05-0121CR (JWS)

constructions of the statute." *Cotton States Mutual Insurance Company v. Anderson*, 749 F.2d 663 (11th Cir. 1984) (citation and quotation omitted). Exousia has not and cannot meet this standard, as the plain meaning of the regulation precludes Exousia's interpretations of the "mouth of Sapun Creek" and of the eastern boundary line, as discussed in greater detail above. *Supra at 16-26.*

Even if Exousia had identified a reasonable interpretation that made its conduct valid, the rule of lenity would not apply to this case because this is not a criminal proceeding. Appellant considers the Noatak CUA regulation as subjecting individuals to criminal prosecution and as a "penal statute." Exousia Br. at 19, 21. However the state regulation is a strict liability offense. *See* 5 Alaska Admin. Code § 92.002. As Judge Roberts has stated: the conduct proscribed in the regulation is *malum prohibitum*, not inherently evil; wrong only because prohibited by a regulation. Order re Mtn to Dismiss at 3 (Docket No. 55). Moreover, the rule of lenity is not a constitutional right and there is no case law indicating that the rule of lenity applies to Petty Offenses.

> c. The cases and regulations cited by Exousia do not support its contention that the regulation is constitutionally deficient due to the uncertainty as the exact location of the eastern boundary.

The lack of absolute certainty in the regulation's definition of the boundaries of the corridor does not bar applicability of the regulation to Exousia's illegal conduct. Exousia devotes several pages to pointing out that the mouths of actively flowing bodies of water such as rivers, streams and creeks

change over time. As discussed in greater detail below, the cases cited by

Exousia do not stand for the proposition that a boundary that may change over

time must be marked or it is constitutionally deficient. These cases and

arguments were considered and rejected by Judge Roberts in his Order

Regarding Motion to Dismiss of September 22, 2005. (Docket No. 55).

The 1925 Ninth Circuit case *Booth Fisheries Co. v. U.S.*, 6 F.2d 500 (9th Cir.

1925), is a case in point. In *Booth*, the government prosecuted Booth Fisheries

Company for maintaining and/or operating a fish trap within 500 yards of the

mouth of a stream. The distance from the trap to the point where the stream

entered a cove was more than 500 yards. However the distance from the trap to

a point on the stream where it crossed the tide flats at low tide, presumably the

point where the salt and fresh waters meet at low tide, was less than 500 yards.

The Ninth Circuit noted that it was possible that the mouth of the stream could

be located at the point where the stream enters the cove or at the point on the

tide flats where the fresh and salt waters meet at low tide and stated: **"If located**

**at the former point, [referring to point where the stream enters the cove] there**

**has been no violation of the law."** 6 F.2d at 501 (Emphasis Added). The Ninth

Circuit held that it was improper for a court or jury to ascertain the boundaries of

the prohibited area, because this determination rested with the Secretary of

Commerce. The Ninth Circuit reversed the judgment and remanded the case for

a new trial because the Secretary of Commerce had failed to act upon his

delegated authority and it was impossible to determine the boundaries of the prohibited area.

The decisions in *United States v. Peck* and in *Rustad v. United States* do not compel a different answer. *Peck,* 95 F. Supp. 465 (D.Ak. 1951) and *Rustad,* 258 F.2d 563 (9th Cir. 1958), *cert denied* 79 S. Ct. 222 (1958). In *Peck,* the defendant was alleged to have been close enough to the mouth of the river where the exact location of the mouth made a difference. In *Rustad,* the Ninth Circuit upheld several criminal convictions for violation of a regulation restricting fishing in the waters of Alaska even though the regulation simply referred to "Zimovia Strait" because Zimovia Strait was shown in maps that defendants had in their boats. 258 F.2d at 566-7. Likewise, the boundaries of the Noatak CUA are found in maps available to the public and easily determinable.

Moreover, the Noatak CUA regulation does not violate due process just because the State delineated the Koyukuk Controlled Use Area with latitude / longitude coordinates. The Koyukuk Controlled Use Area is not as simple as a corridor along a particular river. In any case, the question before the court is not whether the State of Alaska could have done a better job. The question is whether the State did a good enough job. Contrary to Defendant's assertions, the Government was not required to prove the exact physical location of the mouth of Sapun Creek or the eastern boundary line at trial. The Government was

only required to prove that Defendant was within the boundaries of the CUA. The Government did so.

## H.     CONCLUSION

Exousia's appeal lacks factual and legal support. The evidence was more than sufficient for Magistrate Judge Roberts to find Exousia guilty of violating the state regulation for the Noatak Controlled Use Area, and therefore the terms of its Incidental Business Permit. Exousia had fair and adequate knowledge that its conduct was prohibited. The State of Alaska was not required to take any further action to specifically set or mark the location of the boundaries of the CUA in order for a person of average intelligence to determine that Defendant's conduct occurred within its boundaries. For the above reasons, the United States requests that Exousia's conviction be upheld.

Respectfully submitted this 8th day of May, 2006, in Anchorage, Alaska.

DEBORAH M. SMITH
ACTING UNITED STATES ATTORNEY

LISA D. DOEHL
Special Assistant U.S. Attorney

## CERTIFICATE OF SERVICE

I hereby certify that on May 8, 2006, a
copy of the foregoing APPELEE'S
BRIEF was served by facsimile and by
regular mail on the following:
Charles A. Winegarden, Esq.
100 Trading Bay Drive, Suite 8
Kenai, Alaska 99611
fax: 907 283-5771


Twyla S. Greer, Legal Assistant
Office of the Solicitor, Alaska Region