UNITED STATES DISTRICT COURT

DISTRICT OF ALASKA

| | |
|---|---|
| EXOUSIA, INC., d/b/a MAVRIK AIRE, )<br>)<br>    Appellant, )<br>)<br>vs. )<br>)<br>)<br>UNITED STATES OF AMERICA, )<br>)<br>    Appellee. )<br>) | 3:05-cr-00121 JWS<br><br>ORDER AND OPINION<br><br>[Re: Appeal at Docket 12] |

## I.  MATTER PRESENTED

At docket 12, appellant Exousia, Inc., d/b/a/ Mavrik Aire ("Exousia"), appeals the final memorandum opinion issued by United States Magistrate Judge John D. Roberts in the underlying criminal matter on November 22, 2005.[1] Appellee United States of America's brief in opposition is filed at docket 13. Appellant's reply is filed at docket 21.

## II.  BACKGROUND

In May 2004, the National Park System issued an Incidental Business Permit to Exousia, authorizing Exousia to conduct air taxi services for transporting big game hunters in the Noatak National Preserve during 2004 and 2005. The permit expressly required Exousia to operate in compliance with all pertinent federal, state, and local laws and regulations.

---

[1] Doc. 78 in 3:04-cr-00289 JDR, *United States of America v. Exousia*.

Alaska regulations restrict the use of aircraft for big game hunting in the Noatak Controlled Use Area ("CUA"), which is defined by regulation as "that portion of Unit 23 in a corridor extending five miles on either side of, and including, the Noatak River, including the river, beginning at the mouth of the Noatak River, and extending upstream to the mouth of Sapun Creek."[2]  Pursuant to 5 AAC § 92.540(9)(A)(ii), the Noatak CUA "is closed from August 25 through September 15 to the use of aircraft in any manner for big game hunting, including transportation of big game hunters, their hunting gear, or parts of big game."  The regulation does not, however, apply to "the transportation of big game hunters, their hunting gear, or parts of big game to and between public airports."[3]

Alaska Hunting Regulations Booklet No. 45, effective July 1, 2004, through June 30, 2005, contains a map in which the restricted area around the Noatak River is shaded in red.[4]  The Alaska Department of Fish and Wildlife also publishes a map of the Noatak CUA on its website.[5]  In both the map in the hunting regulation booklet and the map on the website, the eastern boundary of the Noatak CUA aligns with Sapun Creek where it intersects the Noatak River.  The eastern boundary of the Noatak CUA is depicted as a straight line in the hunting regulation booklet, but is depicted with a slight angle to the left on the website map.

On September 1, 2004, Exousia president Craig Schweitzer, a commercial pilot, flew four game hunters to an unnamed lake (referred to as Lake 35) within the Noatak National Preserve.  The four hunters intended to hunt caribou.  Schweitzer landed the plane on Lake 35, and the hunters set up camp on the northeast corner of the lake.  On September 6, 2004, Schweitzer returned to Lake 35 and picked up the hunters and the meat of four caribou.[6]

---

[2] 5 AAC § 92.540(9)(A)(i).

[3] 5 AAC § 92.540(9)(A)(ii).

[4] Plaintiff's exh. 15 at 8, doc. 17.

[5] Plaintiff's exh. 2, doc. 17.

[6] Plaintiff's exh. 18 at 8, doc. 17.

On August 1, 2005, the government filed an information charging Exousia with violating a condition of its Incidental Business Permit "by transporting big game hunters, by aircraft, to a location within the Noatak [CUA] in violation of [5 AAC § 92.540(9)(A)]." The information further charged that the above acts constitute a violation 36 C.F.R. § 1.6(g)(2) and 16 U.S.C. § 3, a Class B misdemeanor.[7]

Following a two-day bench trial, the magistrate judge found Exousia guilty of violating 36 C.F.R. § 1.6 (g)(2) and 16 U.S.C. § 3. The magistrate judge sentenced Exousia to pay a fine of $500.00 and a special assessment of $50.00.[8] This appeal follows. This court has jurisdiction pursuant to 18 U.S.C. § 3402.

### III.  STANDARD OF REVIEW

Claims of insufficient evidence are reviewed *de novo*.[9] There is sufficient evidence to support a conviction if, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[10] Questions of law, including the constitutionality of a statute, are also reviewed *de novo*.[11]

### IV.  DISCUSSION

Appellant first argues that the court "erred in determining that the Government proved beyond a reasonable doubt that the lake landed on by Exousia agents in September of 2004 is located within the boundaries of the Noatak [CUA] as defined by [5 AAC § 92.540(9)(A)(I)]."[12] Exousia specifically argues that "it cannot be ascertained beyond a reasonable doubt that the lake is within the restricted area" without "definitive

---

[7]Doc. 43.

[8]Doc. 91.

[9]*United States v. Shipsey*, 363 F.3d 962, 971 n.8 (9th Cir, 2004).

[10]*Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Shipsey*, 363 F.3d at 971 n.8.

[11]*Pullman-Standard v. Swint*, 456 U.S. 273, 289 n.19 (1982); *United States v. Carranza*, 289 F.3d 634, 643 (9th Cir. 2002).

[12]Doc. 12 at 11.

proof from an authorized source" identifying the exact location of the mouth of Sapun Creek and the entire eastern boundary of the Noatak CUA.[13]

Exousia does not cite, nor is the court aware of, any authority requiring the State of Alaska to physically mark the location a CUA boundary or to provide the geographic coordinates for a CUA boundary in order to enforce a regulation establishing a CUA. Moreover, based on the facts in this case, it is not necessary to identify the exact location of the entire eastern boundary of the Noatak CUA to determine that the unnamed lake upon which Exousia landed is within the boundaries of the Noatak CUA. Exousia does not dispute and the undisputed evidence on record shows that Lake 35 is within five miles of the northern edge of the Noatak River. Global Positioning System ("GPS") readings taken by Kean Mihata, a park ranger, Joel Cusick, a Global Information Systems Specialist, and Henry Corning, one of the four hunters, indicate that the distance from the Noatak River to the hunting camp was between 1.50 miles to 2.24 miles, depending on which GPS point was used for the Noatak River.[14] In addition, the undisputed evidence on record shows that GPS readings are accurate to plus or minus ten meters.

Furthermore, the United States Geological Survey map in evidence[15] and the map of the Noatak CUA on the Alaska Department of Fish and Wildlife website show that Sapun Creek enters into the Noatak River east of Lake 35. In addition, Cusick, Mihata, and Dan Stevenson, another park ranger, testified that Lake 35 is located to the west of where Sapun Creek enters the Noatak River.

Exousia argues that braiding of the Sapun Creek may extend the mouth of the Sapun Creek west of Lake 35, but does not provide any credible evidence in support of this argument. Exousia further argues that "[w]hether or not the lake is actually west of the mouth of Sapun Creek is immaterial if the angle of the entire eastern boundary is

---

[13]Doc. 12 at 19, doc. 21 at 7-8.

[14]Plaintiff's exh. 10, doc. 17.

[15]Plaintiff's exh. 1, doc. 17.

such that [the] lake is outside the restricted area."[16]  In order for Lake 35 to fall outside of the Noatak CUA, the eastern boundary of the CUA would have to be angled significantly to the right.  However, the map in the hunting regulations booklet depicts the eastern edge of the Noatak CUA as a straight up and down line, and the map on the aforementioned website depicts the eastern edge as angling slightly to the left.  Under either depiction, Lake 35 is west of the eastern boundary of the Noatak CUA.  Viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that the unnamed lake on which Exousia landed on September 1, 2004, was within the Noatak CUA.

Exousia next argues that the state regulation upon which its federal conviction is predicated is "unconstitutionally vague, imprecise, indefinite and ambiguous."[17]  Exousia specifically argues that Section 92.540(9)(A)(I) identifies the mouth of Sapun Creek as one point of the eastern boundary of the Noatak CUA, but does not provide adequate notice of the northern point of the eastern boundary.

Section 92.540(9)(A)(I) describes the Noatak CUA as "that portion of Unit 23 in a corridor extending five miles on either side of, and including, the Noatak River, including the river, beginning at the mouth of the Noatak River, and extending upstream to the mouth of Sapun Creek."[18]  Alaska regulations also define "stream mouth" as "the downstream point defined as a straight line running from the most downstream extremity on one streambank to the most downstream extremity on the other streambank, or a point defined and marked by the department."[19]  In examining a statute or regulation for vagueness, the court "must determine whether a person of average intelligence would reasonably understand that the charged conduct is

---

[16]Doc. 12 at 19.

[17]Doc. 12 at 11.

[18]5 AAC § 92.540(9)(A)(I).

[19]5 AAC § 75.995(27).

proscribed."[20]  The statute or regulation must be examined in light of the facts of the case at hand.[21]

In light of the facts of this case, a person of reasonable intelligence would understand that Lake 35 was within five miles of the Noatak River and was west of the mouth of the Sapun Creek, and thus was within the Noatak CUA as defined by 5 AAC § 92.540(9)(A)(I).  In fact, Henry Corning, one of the four hunters, testified that based on his review of the hunting regulations booklet and the reading on his GPS, he thought their hunting camp was "inside the exclusion zone."[22]  Contrary to Exousia's argument, the description of the Noatak CUA in Section 92.540(9)(A)(i) is not "so vague and standardless that it leaves the public uncertain as to" what conduct is prohibited or what area is restricted.[23]  The regulation therefore does not offend due process.[24]

## V.  CONCLUSION

For the reasons set out above, the judgment of the magistrate judge is **AFFIRMED**.

DATED at Anchorage, Alaska, this 9th day of August 2006.

/s/
JOHN W. SEDWICK
UNITED STATES DISTRICT JUDGE

---

[20] *United States v. Williams*, 441 F.3d 716, 724 (9th Cir. 2006).

[21] *Id.*

[22] Transcript at 1-33, doc. 6.

[23] *Dahl*, 314 F.3d at 978-979 (quoting *Giaccio v. Pennsylvania*, 382 U.S. 399, 402-403 (1966)).

[24] *Id.*